KYLE SCHUMACHER (BAR #121887)
kschumacher@perryshields.com
**PERRY, SHIELDS, CAMPBELL,
FLOYD, PLLC**
227 N. Loop 1604 E. Ste. 130
San Antonio, TX. 78232
503-482-8137 ph
281-715-3209 fax

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON – PORTLAND DIVISION

| | |
|---|---|
| Randall Darin Knock**,**<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>Equifax Information Services, LLC; U.S. Bank National Association; and DOES 1 through 100 inclusive,<br><br>　　　　　　　Defendants. | CASE NO. 3:20-cv-00686<br><br>PLAINTIFF'S COMPLAINT FOR DAMAGES:<br><br>1.　Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff **RANDALL DARIN KNOCK** ("Plaintiff" or "Knock"), an individual, based on information and belief, to allege as follows:

**<u>INTRODUCTION</u>**

1.　　This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt included in Plaintiff's Chapter 7 bankruptcy.

2.　　Here, Defendant U.S. Bank National Association ("US Bank") is not reporting that Plaintiff's account was included and discharged in bankruptcy.

3.　　The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking

system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4.      A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5.      The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6.      In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7.      Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore industry standards for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8.      Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9.      This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

### JURISDICTION & VENUE

10.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. 1681.

12.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13.     Plaintiff alleges that, for purposes of establishing residency under 28 § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

//

//

## GENERAL ALLEGATIONS

14.     Plaintiff alleges that US Bank was included in Plaintiff's Chapter 7 bankruptcy filing in that each debt occurred pre-petition and was subsequently discharged.

15.     Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

16.     Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized industry standard.

17.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard for credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his FICO Score.

18.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

19.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      FICO, Inc.**

20.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

21.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

22.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

23.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

24.    Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

25.    There are twenty-eight (28) FICO Scores that are commonly used by lenders.

26.    A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

27.    The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

28.    FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with credit reporting industry standards.

29.    There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

30.    Each of the five (5) factors is weighted differently by FICO.

31.    In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

32.    Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

33.    In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

34.    Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

35.    FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

36.    The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same

level of severity with respect to their FICO Score and FICO uses the *filing date*, under both Chapters, to determine how long ago the bankruptcy took place.

**B.    Metro 2**

37.    The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

38.    The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner that is understood to be the most accurate in reporting a debt. In other word, the Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

39.    The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

40.    The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt accurately.

41.    The CDIA is *the* expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

a.    The CDIA offers a FCRA certificate program for all CRAs.

b.    The CDIA offers a FCRA awareness program for all CRAs.

c.    The CDIA offers a FCRA certificate program for DFs.

d.    The CDIA offers a FCRA awareness program for DFs.

e.    The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

f.    The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

g.    The CDIA developed a credit reporting resource guide for accurately reporting credit.

42.    The CDIA's Metro 2 format is accepted by all CRAs.

43.    The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

44.    The CRRG outlines the industry standards for most accurately reporting debts using Metro 2 format.

45.    The CRRG is not readily available to the public. It can be purchased for $229.45.

46.    Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will not grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

47.    When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

48.    The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

49.    If the Metro 2 data received by FICO deviates from industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.    e-OSCAR**

50.    e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

51.    When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

52.    The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**D.    Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

53.    When a consumer files bankruptcy, certain credit reporting industry standards exist.

54.    Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

55.    The Consumer Information Indicator ("CII") is a critical field in the Metro 2 format that indicates a special condition that applies to a specific consumer.

56.    Under Metro 2, the CII must be reported on only the consumer to whom the information applies.

57.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

58.     In the consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed and is active, but no discharge has been entered.

59.     CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

60.     The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed, but the chapter is undesignated/unknown.

61.     The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

62.     The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged. In addition, post discharged balances and past due balances should be updated to reflect zero (0) balances. The payment history should also not reflect missed payments moving forward.

63.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

64.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

65.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent *in personam* collection activity.

66.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

67.     The FRCA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was *filed*.

68.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

69.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

70.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**E.    Plaintiff's Debt was Discharged Pursuant to his Bankruptcy**

71.     Plaintiff filed a voluntary petition for Chapter 13 bankruptcy on November 4, 2015 in order to repair his creditworthiness and FICO Score.

72.     Plaintiff listed the US Bank on Schedule F of his bankruptcy petition as holding an unsecured nonpriority claim.

73.     Plaintiff converted his Chapter 13 bankruptcy to a Chapter 7 on August 1, 2019.

74.     Plaintiff's bankruptcy was discharged on November 5, 2019.

**F.    Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

75.     On November 14, 2019, Plaintiff ordered a three-bureau credit report from Equifax to ensure proper reporting by Plaintiff's creditors (the "November 14 Credit Reports").

76.     Plaintiff noticed adverse tradelines in his November 14 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with credit reporting industry standards.

77.     Plaintiff then disputed the inaccurate tradeline (regarding the account with US Bank) via certified mail to Equifax on or about November 20, 2019 (the "Dispute Letter").

78.     Plaintiff's Dispute Letter specifically put US Bank on notice that Plaintiff filed for bankruptcy, received a bankruptcy discharge, and that Plaintiff's accounts should be updated post discharge.

79.     Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the US Bank account, addressing each tradeline individually.

80.     Plaintiff requested that any derogatory reporting be updated.

81.     Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to US Bank, as the DF, via an ACDV through e-OSCAR.

82.     On February 6, 2020, Plaintiff ordered a second credit report from Equifax to determine if his accounts were updated.

### a.    Inaccuracy – U.S. Bank National Association

83.    Despite actual knowledge, US Bank continued to report to Equifax that Plaintiff's account, beginning in 00015XXXXXXXXXX, with a payment status tradeline of "not more than two payments past due" even though the account has a zero balance. Further, US Bank is not reporting Plaintiff's bankruptcy discharge.

84.    Plaintiff alleges that US Bank did not investigate whether Plaintiff filed for bankruptcy.

85.    US Bank did not update the tradeline to reflect that Plaintiff obtained a discharge in bankruptcy.

86.    The Credit Reporting Agencies provided notice to US Bank that Plaintiff was disputing the inaccurate and misleading information, but US Bank failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

87.    Based on Plaintiff's dispute, US Bank should have known that Plaintiff received a discharge in his bankruptcy proceedings.

88.    The most basic investigation would include a simple review of well-established credit reporting industry standards on how to report a bankruptcy.

89.    Plaintiff alleges that US Bank did not review well-established industry standards for credit reporting.

90.    If US Bank reviewed such standards, US Bank would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

91.    US Bank should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy.

92.    By continuing to report Plaintiff's account payment status tradeline of "not more than two payments past due", it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not included and discharged in Plaintiff's Bankruptcy.

93.    US Bank's lack of investigation is unreasonable.

### G.    Damages

94.    Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

95.    As a result of the incorrect reporting, Plaintiff has also suffered emotional harm and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

96.    Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by US Bank.

97.    US Bank's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

98.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax Failed to Assure Credit Reporting Accuracy**

99.    Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

100.    Had Equifax maintained reasonable procedures to assure maximum accuracy, Equifax would never have allowed the US Bank to report the account as described herein.

101.    Equifax knew, or should have known, (1) that the US Bank account was included and discharged in bankruptcy and (2) that the US Bank account should not have been reported with a payment status tradeline of "not more than two payments past due" on account of the Chapter 7 discharge.

102.    As a result of Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

103.    Equifax's violation, as described herein, was willful; specifically, Equifax has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

104.    Equifax regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

105.    To the extent Equifax does send consumer disputes, Equifax sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

106.    Equifax's employees receive little to no training concerning how to accurately report consumer debt.

107.    Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

108.    Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

109.    Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

110.    As a result of Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

111.    Equifax's violations were willful, rendering Equifax individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

112.    In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

113.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

### (Against Defendants and Does 1-100)

114.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     US Bank Failed to Reinvestigate Following Plaintiff's Dispute**

115.    Pursuant to 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

116.    US Bank violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

117.    Equifax provided notice to US Bank that Plaintiff was disputing the inaccurate and misleading information; however, US Bank failed to conduct a reasonable investigation as required by the FCRA.

118.    Based on Plaintiff's dispute, US Bank should have known its account was included in Plaintiff's Chapter 7 bankruptcy and ceased its inaccurate reporting.

119.    The lack of investigation, as required by the FCRA, is unreasonable.

**B.     Willful Violations**

120.    Plaintiff further alleges that US Bank has not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and, as such, have developed reckless policies and procedures.

121.    Plaintiff alleges that rather than train its employees on accurate credit reporting and industry standards, US Bank employees tasked with reviewing disputes are expected to confirm the information being reported as accurate instead of investigating the reporting.

**C.     Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

122.    Pursuant to 15 U.S.C. 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the US Bank account.

123.    Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

124.    Equifax is not a passive entity bound to report whatever information a data furnisher provides.

125.    Plaintiff alleges Equifax is readily familiar with Metro 2 guidelines and credit reporting industry standards.

126.    Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

127.    Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

128.    Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that US Bank was not reporting the account at issue correctly.

129.    Had Equifax conducted a proper investigation it could have closed or bookended the US Bank debt by adding a notation on the credit report on its tradeline that the debt was in fact included and discharged in Plaintiff's Chapter 7 bankruptcy.

130.    Equifax continued to report the US Bank account with a payment status tradeline of "not more than two payments past due".

131.    Equifax, therefore, did not do the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

**THIRD CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))**

**(Against Defendants and Does 1-100)**

132.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Equifax Failed to Review and Consider all Relevant Information**

133.    Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

134.    Equifax's violation of 15 U.S.C. § 1681i(a)(4) has caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

135.    Equifax's violation was willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

136.    In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

137.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

138.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.      Equifax Failed to Delete Disputed and Inaccurate Information**

139.    Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

140.    Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), has resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.      Willful Violations**

141.    Equifax's violation was willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

142.    In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

143.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

144.    WHEREFORE, Plaintiff prays for judgment as follows:

    a.  For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

    b.  Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

    c.  Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

    d.   Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

    e.   For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

    f.   For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**PERRY, SHIELDS, CAMPBELL, FLOYD, PLLC**

Dated: April 27, 2020

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.


**PERRY, SHIELDS, CAMPBELL, FLOYD, PLLC**


Dated: April 27, 2020                          _/s/ Kyle Schumacher_
                                               Kyle Schumacher
                                               Attorney for Plaintiff